IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| UNITED STATES OF AMERICA | : | |
|---|---|---|
| | : | CRIMINAL INDICTMENT |
| v. | : | NO.: 2:13-CR-008-RWS-JCF |
| | : | |
| TRACY L. CLARK | : | |

## ORDER and REPORT AND RECOMMENDATION

This case is before the Court on Defendant's motions to suppress evidence seized by law enforcement officers and to suppress Defendant's statements. (Docs. 16, 17). Because investigators seized evidence from Defendant's vehicle and residence pursuant to Defendant's voluntary consent to search those areas and during a search of his residence pursuant to a search warrant, it is **RECOMMENDED** that Defendant's motion to seize evidence be **DENIED**. Further, because Defendant's statements were not made involuntarily or in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), it is **RECOMMENDED** that Defendant's motion to suppress his statements be **DENIED**.

## Background

An Indictment filed March 5, 2013 (Doc. 1) charges Defendant with dealing in firearms without a federal license, in violation of 18 U.S.C. § 922(a)(1)(A) (Count One), and receiving, possessing, and accepting stolen firearms as security for a loan, in violation of 18 U.S.C. § 922(j) (Counts Two and Three).

1

On April 18, 2013, Defendant filed the pending motions to suppress. (Docs. 16, 17). The Court conducted a hearing on Defendant's motions on July 2, 2013 (*see* Doc. 23), and the transcript of that hearing was filed on August 15, 2013 (Doc. 25).[1] The Government filed a post-hearing brief on September 13, 2013 (Doc. 27), and Defendant filed a response brief on October 9, 2013 (Doc. 29); the Government did not file a reply. With briefing complete, the undersigned now considers the merits of Defendant's motions.

## Facts

These facts are taken from the July 2, 2013 hearing testimony of Jeffrey Scott Lilly, a former investigator with the Hall County Sheriff, Diana Blihovde, an investigator with the White County Sheriff's Office, Jon Judkins, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and exhibits tendered during the hearing.

In September 2011, Philip Lowther, who had been arrested for theft and burglary, told White County investigators that he had sold some of the stolen items, including a watch, some coins, and some firearms, to Defendant at County Line Salvage in Hall County. (Tr. 65-68, 73). Around September 13, 2011, Investigator Blihovde and another investigator spoke with Defendant at County Line Salvage about Lowther's statement that he had sold Defendant stolen

---

[1] References to the transcript of the hearing are designated as "Tr. ___."

2

property. (Tr. 68-69). Defendant admitted that he had purchased long guns, a watch, and a two dollar certificate from Lowther outside County Line Salvage, but he denied purchasing handguns from him. (Tr. 70). Defendant told the investigators that if he was able to recover any of the items, he would call Investigator Blihovde. (*Id.*).

On September 14, 2011, Defendant called Blihovde and told her that he had located a pocket watch and two double-barrel shotguns that Lowther had sold him. (Tr. 70-71). Defendant and Blihovde met later that day, and Defendant gave Blihovde a pocket watch, two double-barrel shotguns, and a scope, as documented on a White County Sheriff's Office Receipt for Property. (Tr. 70-71; Gov't Ex. 1). Defendant called Blihovde later and told her that he had located a single-barrel shotgun he bought from Lowther; they met again on September 16, 2011, and Defendant gave Blihovde the shotgun. (Tr. 71-72; Gov't Ex. 2).

Investigator Blihovde took the firearms to Lowther's burglary victim, but she could only identify the single-barrel shotgun as belonging to her. (Tr. 72).

On September 20, 2011, Blihovde called Investigator Lilly with the Hall County Sheriff's Office and told him about her investigation. (Tr. 6-7, 73). They decided to again speak with Defendant to try to recover more stolen property and explore his relationship with Lowther. (Tr. 7, 48). So on that date, Lilly, Blihovde, and another White County investigator went to County Line Salvage to

talk to Defendant. (Tr. 8-9, 74-76). Lilly wore a polo shirt with the Hall County Sheriff's Office emblem on it and a pair of khakis, and his firearm was visible but holstered; the other investigators were dressed and armed similarly. (Tr. 9-10, 75-77). Defendant agreed to speak with them and led them into the warehouse where they sat at a table, open to employees and customers. (Tr. 9, 11, 77). The investigators spoke with Defendant in a casual, conversational tone; Defendant was free to leave, and none of the investigators drew their weapons. (Tr. 10-11, 75-77).

Investigator Lilly explained to Defendant that they were following up on the White County burglary investigation and wanted to ask Defendant some questions. (Tr. 12). Lilly told Defendant that he was not under arrest, but "just to be on the safe side," he advised Defendant of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), i.e., the right to remain silent and that anything he said could be used against him, the right to have an attorney present during questioning, and the right to appointed counsel if he could not afford an attorney. (Tr. 12-14, 78). Defendant stated that he understood his rights, and he agreed to talk with the investigators. (Tr. 14). The investigators made no promises to Defendant nor threatened him to get him to agree to speak with them. (*Id.*).

During their conversation, Lilly asked Defendant if he had any firearms in his vehicles, and Defendant said that he did. (Tr. 16). Lilly asked Defendant for consent to search his vehicle, and Defendant consented, stating that he had

"nothing to hide." (Tr. 16, 79). Defendant then led the investigators to his truck, and they searched it. (Tr. 16-18, 79-80). Defendant was present during the search and did nothing to stop the search or indicate that he withdrew his consent to the search. (Tr. 25, 80-81). The investigators found 12 firearms in Defendant's truck, one of which, a .357, was reported stolen in Henry County, so Lilly seized it. (Tr. 19). Lilly explained to Defendant that he was seizing the .357 because it was reported stolen, and Defendant responded that he had purchased the .357, a .38, and an SKS at the same time. (Tr. 19-20). The .38 was in Defendant's vehicle, so Lilly seized it, and Defendant stated that the SKS was at his residence. (Tr. 20). Lilly also found a bag with ledgers listing the items Defendant had purchased, so he seized the bag. (Tr. 21, 24). Lilly documented the items seized from Defendant's truck on a Hall County Sheriff's Office Property and Evidence Form. (Tr. 22-24; Gov't Ex. 5).

Lilly then told Defendant that he wanted to search his house for stolen firearms, and asked Defendant if he would have a problem with the investigators searching his house. (Tr. 25). Defendant stated that he "didn't have a problem with it," and he read and signed a White County Consent to Search form, consenting to the search of his residence. (Tr. 25-27, 81-82; Gov't Ex. 3). Defendant then drove to his house, leading the investigators there. (Tr. 28, 83). Defendant unlocked his house and allowed the investigators to go inside. (Tr. 29).

5

Lilly asked Defendant where the firearms were; Defendant stated that the majority were in his bedroom and led the investigators to that room. (Tr. 29-30). The investigators found 36 firearms in the house, and noted the make, model, and serial number of each to later check to see if any were reported stolen. (Tr. 30-31). They seized the SKS, which Defendant had said that he purchased along with the .357 found in his truck which had been reported stolen. (Tr. 31; Gov't Ex. 5). Defendant did not object during the search, and he assisted the investigators by opening up locked boxes and safes. (Tr. 32). Before he left Defendant's residence, Lilly gave Defendant his card and told Defendant if he had any questions or thought of anything that might be helpful, to call Lilly. (Tr. 33-34).

Defendant called Lilly the next day, September 21st, and told him that he had found more firearms that he purchased from Lowther, and that these firearms might be the ones that came from the White County burglary committed by Lowther. (Tr. 34). About 10 to 15 minutes later, Defendant brought five firearms to Lilly's office and gave them to Lilly. (Tr. 35; Gov't Ex. 4).

On September 22, 2011, Lilly applied for and obtained a search warrant from a Hall County Magistrate Judge authorizing the search of Defendant's residence. (Tr. 36-37; Gov't Exs. 6, 7). Lilly and others executed the warrant on September 23rd. (Tr. 38). Investigators seized 43 or 44 firearms, as documented

on a Hall County Sheriff's Office Property and Evidence Form.  (Tr. 38-39; Gov't Ex. 9).

In November 2011, Investigator Lilly referred the matter to ATF Special Agent Judkins.  (Tr. 98).  At Lilly's request, Defendant voluntarily came to the Hall County Sheriff's Office on January 26, 2012, and Lilly and Agent Judkins interviewed him.  (Tr. 99).  No charges were pending against Defendant at that point, and the agents told Defendant he was not under arrest and could terminate the interview at any time.  (Tr. 99, 101).  Agent Judkins read Defendant his *Miranda* rights, and Defendant agreed to waive those rights and speak with the agents without a lawyer present, and initialed and signed a *Miranda* waiver form.  (Tr. 101-04; Gov't Ex. 10).  The agents did not threaten or pressure Defendant or make any promises in exchange for speaking with them.  (Tr. 104-05; Gov't Ex. 10).  Defendant never asked to terminate the interview, which lasted at least an hour.  (Tr. 105).  Defendant was allowed to leave after the interview ended.  (Tr. 106).

After Defendant was indicted, Agent Judkins arrested him at his residence on March 21, 2013 at approximately 6 a.m. and took him to the Hall County Sheriff's Office, where Judkins informed him of the charges against him, and advised him of his *Miranda* rights.  (Tr. 106-09, 115).  Defendant indicated that he understood his rights, and he again waived them and agreed to be interviewed

7

without an attorney present, as evidenced by his initials and signature on a *Miranda* waiver form. (Tr. 109-10; Gov't Ex. 11). The agents did not threaten or pressure Defendant, or make any promises to him to obtain his *Miranda* waiver or statements. (Tr. 110-11). The interview lasted almost three hours. (Tr. 117).

## Discussion

In his Preliminary Motion to Suppress, Defendant challenges the warrantless seizure of evidence from Defendant's "homeplace, business and motor vehicles," and to the extent that evidence was seized pursuant to a warrant, Defendant contends that the search warrant was not issued on probable cause. (*See* Doc. 16). In his Motion for a Jackson-Denno Hearing[2], Defendant requests that the Court hold a hearing "to determine whether [his] statements were made knowingly and voluntarily[.]" (*See* Doc. 17).

### I.     Defendant's Motion To Suppress Evidence (Doc. 16)

#### A.     Evidence Seized Without A Warrant

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. "Under the Fourth Amendment, searches and seizures inside a home without a warrant are presumptively unreasonable." *United*

---

[2] *See Jackson v. Denno*, 378 U.S. 368 (1964).

8

*States v. Davis*, 313 F.3d 1300, 1302 (11th Cir. 2002) (internal quotation omitted). Where a seizure is made without a warrant, the burden is on the government to "demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment." *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983).

The exception to the warrant requirement at issue in this case involves the seizure of evidence pursuant to an individual's consent. "[L]aw enforcement officers may search an individual's property without a warrant, as long as the individual voluntarily consents to the search." *United States v. Brumfield*, 352 Fed. Appx. 366, 367 (11th Cir. 2009) (unpublished decision) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219-22 (1973)). "Whether consent is voluntary is a fact question determined according to the totality of the circumstances," *Brumfield*, 352 Fed. Appx. at 367 (quotation omitted), and the government bears the burden of proving the existence and voluntariness of the consent. *United States v. Acosta*, 363 F.3d 1141, 1151 (11th Cir. 2004).

As an initial matter, Defendant does not appear to seek to suppress evidence which he voluntarily gave to Investigator Blihovde on September 14, 2011, including a pocket watch, two double-barrel shotguns, and a scope; a shotgun he voluntarily gave to Investigator Blihovde on September 16, 2011; and five firearms

he voluntarily gave to Investigator Lilly on September 21, 2011. (*See* Tr. 35, 70-71; *see also* Gov't Exs. 1, 2, 4). To the extent that he does seek the suppression of those items, the undersigned **RECOMMENDS** that motion be **DENIED** because the investigators did not seize them in violation of the Fourth Amendment.

With respect to the evidence that investigators seized from Defendant's truck and residence on September 20, 2011 (*see* Gov't Ex. 5), the undersigned finds that, based on the unchallenged testimony of Investigators Lilly and Blihovde, as well as the consent to search form authorizing the search of his residence, Defendant voluntarily consented to those searches.[3] The Investigators did not draw their weapons, threaten or pressure Defendant, or make any promises to him to secure his consent. Nor did Defendant say or do anything to indicate during those searches that he objected or wanted to withdraw his consent. Therefore, it is **RECOMMENDED** that Defendant's motion to suppress any evidence seized from his truck and residence on September 20, 2011 be **DENIED**.

B. **Evidence Seized Pursuant to A Warrant**

---

[3] Defendant "concedes that the first search of his home was consensual," but he complains that the White County consent to search form was confusing because it references a vehicle search and "in fact instructed him he was giving up any right to complain about the search of his vehicle, not his home." (Doc. 29 at 2). Although the consent to search form states that Defendant was informed of his right not to have his vehicle searched without a warrant, the form also clearly states that Defendant consented to "a complete search of [his] Residence" at the listed address, and authorized the seizure from his residence "any items which [the investigators] deem necessary to fully conduct their investigation." (Gov't Ex. 3).

Defendant contends that "[t]he search warrant that was issued to conduct the search on September 22, 2011 was more problematic [than the warrantless consent search] and was Fourth Amendment violative." (Doc. 29 at 2). Specifically, Defendant argues that because the investigators had searched Defendant's house two days earlier and recorded the serial numbers on the guns found there, "there is simply no reason to believe that two days later any item legitimately to be seized would be in the place to be searched[.]" (*Id.*).

"Where a search is conducted under the authority of a warrant, the defendant challenging the search carries the burden of showing the warrant to be invalid." *United States v. Kilgore*, 2012 U.S. Dist. LEXIS 154148, at *14 (N.D. Ga. Sept. 13, 2012) (internal quotation omitted), *adopted by* 2012 U.S. Dist. LEXIS 153867 (N.D. Ga. Oct. 26, 2012). "It is not easy for a Defendant to meet this burden, and a judicial preference is accorded searches under a warrant." *United States v. Teague*, No. 2:10-CR-006-RWS-SSC, 2010 U.S. Dist. LEXIS 142717, at *86 (N.D. Ga. Nov. 22, 2010) (internal quotation omitted), *adopted by* 2011 U.S. Dist. LEXIS 42260 (N.D. Ga. Nov. 22, 2010).

"The Fourth Amendment allows warrants to issue on probable cause, a standard well short of absolute certainty." *L.A. County v. Rettele*, 550 U.S. 609, 615 (2007). The task of a magistrate judge, when issuing a warrant, " 'is simply to make a practical, commonsense decision whether, given all the circumstances set

11

forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

The undersigned finds that Lilly's affidavit in support of the search warrant application provided "a fair probability" that evidence of theft and receiving stolen firearms would be found at Defendant's residence. Specifically, the affidavit set forth information about: Lowther's report to investigators that he had sold stolen guns to Defendant; Defendant admitted purchasing guns and other items from Lowther, some of which have since been identified as stolen; the discovery of 12 firearms in Defendant's truck, including a firearm that was reported stolen; the discovery of 36 firearms in Defendant's residence, including one that was reported stolen; Defendant's lack of documentation concerning his purchase of the stolen firearms; and Defendant's surrender of five firearms on September 21, 2011 that were stolen in a burglary in White County. (*See* Gov't Ex. 7).

Defendant's contention that the investigators had already obtained all incriminating evidence they reasonably believed to be in the residence during their consent search (*see* Doc. 29 at 3) is unsupported and fails to undermine a finding of probable cause to support the issuance of the search warrant. Lilly stated in the affidavit that the investigators had recorded the serial numbers of the firearms found in Defendant's residence on September 20, 2011, and that most of the serial

numbers had not been reported as stolen, so they left those firearms at Defendant's home. (*See* Gov't Ex. 7 at 1-2). Lilly further explained that people often do not record the serial numbers for their firearms, and therefore, the serial numbers for stolen firearms are often not listed in the crime information center system (NCIC/GCIC). (*Id.* at 2). Thus, "[i]f serial numbers are not recorded, the only possibilities of firearms being recovered is for the victim to visually identify them or to run a firearm trace through ATF." (*Id.*). Moreover, *after* the September 20, 2011 consent search of his house, Defendant produced additional guns which were stolen in the White County burglary and were identified by their owner by visual inspection or by serial number. (*Id.*). Thus, probable cause, "a standard well short of absolute certainty," existed to believe that additional stolen firearms would be found in Defendant's residence.

Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress evidence seized from his residence on September 23, 2011 pursuant to a search warrant (*see* Gov't Exs. 8, 9) be **DENIED**.

B.  **Defendant's Motion To Suppress Statements (Doc. 17)**

"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. In *Miranda*, the Supreme Court held that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the

use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. Specifically, before a person in custody is interrogated, he must be advised that he has the right to remain silent; that anything he says can and will be used against him in court; that he has the right to consult with a lawyer and to have the lawyer with him during interrogation; and that if he cannot afford a lawyer, a lawyer will be appointed to represent him. *Id*. at 467-73.

Further, when addressing a Fifth Amendment challenge to a statement, "[e]ven if a court finds compliance with *Miranda*, the court must still rule on the confession's voluntariness." *Jarrell v. Balkcom*, 735 F.2d 1242, 1252 (11th Cir. 1984). A statement is not given voluntarily if it is "extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper influence." *Harris v. Dugger*, 874 F.2d 756, 761 (11th Cir. 1989). "The determination of whether a confession is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's free and rational choice." *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994) (citations omitted); *see also Arizona v. Fulminante*, 499 U.S. 279, 285-88 (1991) (noting that voluntariness is determined by the totality of the circumstances). "The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary."

*United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

In his post-hearing brief, Defendant "concedes" that his statements made on September 13, 2011 to Investigator Blihovde, on September 20, 2011 to Investigators Blihovde and Lilly, and on January 26, 2012 to Agent Judkins and Investigator Lilly "were not Miranda violative." (Doc. 29 at 1). Thus, it appears that Defendant does not seek to suppress his statements made on those dates, for good reason. The uncontroverted evidence shows that Defendant freely and voluntarily spoke with law enforcement officers on those dates, with no threats or promises being made to coerce or pressure him into making his statements. Moreover, even though Defendant was not in custody on September 20, 2011 and January 26, 2012, the investigators nonetheless advised him of his *Miranda* rights, which he voluntarily waived. Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress his statements made on September 13, 2011 to Investigator Blihovde, on September 20, 2011 to Investigators Blihovde and Lilly, and on January 26, 2012 to Agent Judkins and Investigator Lilly be **DENIED**.

As to Defendant's March 21, 2013 post-arrest statements, Defendant asserts that his statement "was also apparently not Miranda violative," an unremarkable concession given the uncontroverted evidence that Defendant was advised of his *Miranda* rights prior to that interview. (*See* Gov't Ex. 1). Defendant appears to

contend, however, that his waiver of his *Miranda* rights and statement were not made voluntarily, knowingly, and intelligently because "that interview was conducted after the Defendant was arrested around 6 a.m. . . ., after which the Defendant was placed in the interview room at 6:45 a.m. . . ., and then endured an almost three hour interview." (Doc. 29 at 1). Defendant "suggests that the intentional early morning rousting o[f] an individual at this hour and then interrogating him for almost three hours rises to a violation of his right to be free of a coercive, involuntary confession." (*Id.* at 1-2). The undersigned disagrees and finds that Defendant's post-arrest statements were made voluntarily. Agent Judkins did not threaten or pressure Defendant or make any promises in exchange for his *Miranda* waiver and statements. (*See* Tr. 110-11; Gov't Ex. 11). Regardless of the early hour, Defendant was cooperative, his ability to understand and communicate with the agent did not appear to be impaired, and he was "very clear and articulate in his answers." (*See* Tr. 111, 117).

It is therefore **RECOMMENDED** that Defendant's motion to suppress his March 21, 2013 post-arrest statements be **DENIED**.

### Summary

For the foregoing reasons, it is **RECOMMENDED** that Defendant's motions to suppress evidence and statements (Docs. 16, 17) be **DENIED**.

It is further **ORDERED** that subject to a ruling by the District Judge on any objections to orders or recommendations of the undersigned Magistrate Judge, this case is **certified ready for trial**.

**IT IS SO REPORTED AND RECOMMENDED & ORDERED** this <u>28th</u> day of <u>October</u>, 2013.

    */s/ J. C<small>LAY</small> F<small>ULLER</small>*
J. CLAY FULLER
United States Magistrate Judge